THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GINA WOODS,                              :
                                         :
       Plaintiff,                        : CIVIL ACTION NO. 3:19-CV-00230
                                         : (JUDGE MARIANI)
       v.                                :
                                         :
ASTRAZENECA                              :
PHARMACEUTICALS, L.P., d/b/a             :
AstraZeneca Pharmaceuticals,             :
                                         :
       Defendant.                        :

## MEMORANDUM OPINION
### I. INTRODUCTION

Defendant's Motion for Summary Judgment (Doc. 39) is pending before the Court.

With this Motion, Defendant seeks judgment in its favor on all claims contained in Plaintiff's

Second Amended Complaint (Doc. 26).  (Doc. 39 at 3.)  Plaintiff Gina Woods ("Plaintiff")

filed this action on February 11, 2019, based on her termination from employment with

Defendant AstraZeneca Pharmaceuticals ("AstraZeneca" "Defendant") where she worked

from February 2007 to November 2018.  From November 2015 until the time of termination,

Plaintiff was a Pharmaceutical Sales Specialist for AstraZeneca.  Plaintiff's Second

Amended Complaint identifies four causes of action: 1) Violations of Title VII based on

gender discrimination, gender stereotyping discrimination, retaliation, and hostile work

environment; 2) Violations of the Americans with Disabilities Act, as Amended ("ADAAA")

based on "Actual/Perceived/Record of Disability Discrimination," retaliation, failure to

accommodate, and hostile work environment, 3) Violations of the Family and Medical Leave

Act ("FMLA") based on interference and retaliation; and 4) Violations of the Pennsylvania

Human Relations Act ("PHRA") based on gender discrimination, gender stereotyping

discrimination, retaliation, hostile work environment, actual/perceived/record of disability

discrimination, and failure to accommodate. (Doc. 26 at 13-16.)

For the reasons discussed below, the Court will deny Defendants' motion in part and

grant it in part.

## II. Background[1]

Having begun her employment with AstraZeneca in February 2007, Plaintiff worked

as a Pharmaceutical Sales Specialist ("PSS") on the Diabetes Team at the time of her

termination in November 2018. She began working in the PSS position in November 2015

and was supervised by George Yescavage, Executive District Sales Manager. (Doc. 40 ¶

3-4; Doc. 47-1 ¶¶ 3-4.)

Before transferring to the Diabetes Team in November 2105, Plaintiff had been a

PSS on various other sales teams. (Doc. 26 ¶¶ 12-14.) From 2007 through 2014, her

---

[1] Relevant undisputed facts set out in Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (Doc. 40) and, for the sake of context, some undisputed facts contained in the Second Amended Civil Action (Doc. 26) are included in this section of the Memorandum Opinion. The Court does not consider Plaintiff's Counter-Statement of Facts (Doc. 47-1 at 45-74) because separate statements of fact not directly responsive to the movant's statement of facts are not contemplated by L.R. 56.1 of the Local Rules of Court of the Middle District of Pennsylvania and need not be given any evidentiary value. *See, e.g.*, *Rau v. Allstate*, Civ. A. No. 3:16-CV-359, 2018 WL 6422121, at \*2 (M.D. Pa. Dec. 6, 2018), *aff'd*, 793 F. App'x 84 (3d Cir. 2019).

For the most part, the parties provide citations to the record for the facts alleged. (*See* Docs. 40, 47-1.) With limited exceptions, the Court does not include these citations here.

2

performance was rated "Valued Performance" or better.  (*Id*. ¶ 20(iii).)  In April 2014, she was named a recipient of the 2014 Circle of Excellence Award which recognizes the top 5% performers in AstraZeneca's sales force and MAPS team.  (*Id*. ¶ 20(ii).)

Plaintiff was pregnant with her first child in 2014-2015.  (*Id*. ¶¶ 21-24.)   Because of complications with the pregnancy, Plaintiff was required to take a medical leave of absence a few months prior to giving birth.  (*Id*. ¶ 22.)  Following the birth of her child, Plaintiff returned from maternity leave in September 2015.  (*Id*. ¶ 24.)  Plaintiff did not report to Yescavage at the time.  (Doc. 40 ¶ 30.)

Plaintiff received on overall rating of "3" for 2015 which was the equivalent of "Valued Performance."[2]  (Doc. 26 ¶ 20(iv).)  The 2015 year-end performance evaluation was written by Yescavage (who did not begin to supervise Plaintiff until December 2015) with input from the supervisor of her previous team, Jack Gillen.  (*Id*. ¶ 25.)  Yescavage noted Plaintiff's medical leave, stating "[d]ue to this fact, 2015 was a different year for Gina."  (*Id*.)

In June of 2016, Plaintiff learned she was pregnant.  (*Id*. ¶ 26.)  Like her first pregnancy, Plaintiff's second pregnancy was deemed "high risk," and she was diagnosed with the same health conditions as in her first pregnancy including Intrahepatic Cholestasis of Pregnancy ("ICP"), Hyperemesis Gravidarum ("HG"), and Preeclampsia.  (*Id*. ¶¶ 21, 27.)

---

[2] Plaintiff avers that the rating framework changed to a numerical system in 2015 and, in the new system, a rating of "3" was equivalent to the previous years' rating of "Valued Performer."  (Doc. 26 ¶ 20(iv).)

On December 14, 2016, Plaintiff received her year-end performance evaluation wherein she was given an overall rating of "3." (*Id.* ¶ 29.) In late December 2016, when Plaintiff was approximately seven months pregnant, she began a medical leave of absence. (*Id.* ¶ 30.) Plaintiff delivered her second child in January 2017 and remained out of work on maternity leave until April 24, 2017. (*Id.* ¶ 31; Doc. 48-4 at 4.)

Plaintiff avers that she continued to have serious health conditions when she returned to work including essential hypertension, nausea/vomiting, and migraines. (*Id.* ¶ 32.) Plaintiff further avers that, due to these health conditions, she was required to miss intermittent time from work and be hospitalized (for high blood pressure). (*Id.* ¶ 33.)

In the first two weeks of December 2017, Yescavage provided Plaintiff with her year-end evaluation score in which she was projected to receive an overall rating of "2." (Doc. 40 ¶ 44; Doc. 47-1 ¶ 44.)

In January 2018, Plaintiff made both an anonymous complaint and non-anonymous complaint against Yescavage through Defendant's internal complaint procedure. (Doc. 40 ¶ 45; Doc. 47-1 ¶ 45.) Amanda Haile, Plaintiff's territory sales partner and a Level 3 Senior PSS who had taken leave for her pregnancies while working in Yescavage's district, also made a complaint that Yescavage had discriminated against her. (Doc. 40 ¶ 41, 53; Doc. 47-1 ¶ 41, 53.) Allegations of discrimination by Plaintiff and Haile were investigated by Linda Abbonizio, Senior Employment Practices Partner ("EPP"), and Laura Barton, Commercial Business Director ("CBD"), Diabetes, and Yescavage's supervisor. (*Id.* ¶¶ 55-60.)

4

Plaintiff's claimed discrimination included a statement by Yescavage while she was pregnant in 2016, at which time he stated "you're not going to last. I'm going to have to get someone else to help you." (*Id.* ¶ 46.)

Plaintiff was asked for and provided documentation of the alleged discrimination which included screen shots of text messages and a copy of an article Yescavage had provided to three women under his supervision titled "How to Handle Work When Your Child is Sick,". (*Id.* ¶¶ 54, 60-61.)  Plaintiff agrees with Defendant's summary of the text messages provided:

- In one text message, Mr. Yescavage sent a picture of a beer, which had a Buck on it to his entire team (men and women). (Abbonizio Dep. Exh. P-10.) Ms. Woods testified she thought it inappropriate because it was about alcohol and after work. (Woods Dep. 227:16-22.)

- In another message, he sent a picture of an alcoholic beverage to the entire team (men and women), which said "Moonshine time..." (Abbonizio Dep. Exh. P-10.) Ms. Woods testified that she thought it was inappropriate in that it was a manager promoting drinking. (Woods Dep. 229:14-230:7.)

- In another message, Mr. Yescavage sent a picture of his new snow blower to the entire team (men and women). (Abbonizio Dep. Exh. P-10.) Ms. Woods testified she thought it was inappropriate in that she assumed he wanted his team to drive in the snow. (Woods Dep. 231:14-232:20.) The text went on to tell everyone to "be safe." (Abbonizio Dep. Exh. P-10.)

(Doc. 40 ¶¶ 62-64; Doc. 47-1 ¶¶ 62-64.)

Based on the evidence and interviews with approximately 70% of Yescavage's team, Abbonizio concluded that the text messages and article did not establish a hostile work

environment on the basis of gender and that Yescavage did not engage in gender discrimination against Plaintiff.  (Doc. 40 ¶ 65; Doc. 47-1 ¶ 65.)  Neither Plaintiff nor Haile made any further complaints.   (Doc. 40 ¶ 71; Doc. 47-1 ¶ 71.)  In her resignation letter, Haile expressed appreciation for working with Yescavage and his team.  (*Id.* ¶ 73.)

After again becoming eligible for FMLA leave again in April of 2018, Plaintiff formally requested intermittent FMLA leave to care for and treat her health conditions.  (Doc. 26 ¶ 34.)  Defendant's Absence Management Company, "the Hartford," approved Plaintiff for FMLA intermittent leave beginning on April 27, 2018, and ending on April 26, 2019.  (*Id.* ¶ 35.)  Between April 27, 2018, and November of 2018 when Plaintiff was informed of her termination, Plaintiff had taken approximately 100.5 hours of FMLA intermittent leave.  (*Id.* ¶ 36.)

In April 2018, three separate complaints were made about negative and inappropriate communications from Plaintiff to two of her teammates, Megan Gavin and Mary Ellen McCafferty.  (Doc. 40 ¶ 79; Doc. 47-1 ¶ 79.)  Plaintiff received a "verbal coaching" on more than one occasion about the problem from Abbonizio, and Yescavage also attempted to mediate issues.  (*Id.* ¶¶ 88, 90. 91.)

At about the same time, Gavin and McCafferty raised concerns about Plaintiff's call activity.  (Doc. 40 ¶ 93; Doc. 47-1 ¶ 93.)  Upon initial review, Yescavage noticed some discrepancies and patterns which he determined called for additional review.  (*Id.* ¶ 95.)  After further investigation, Yescavage, Abbonizio, and Barton, met with Plaintiff on October

30, 2018, for an Opportunity to Respond ("OTR") session to discuss concerns regarding Plaintiff's call activity and comments she made to colleagues. (*Id.* ¶ 107**.)** Based on the result of the investigation, Abbonizio prepared a "Final Written Warning" on November 12, 2018, with input from Yescavage and Barton. (*Id.* ¶ 111.) The Final Written Warning stated that Plaintiff would not be eligible for a bonus and she would receive a performance rating of "1" for 2018. (*Id.* ¶ 112.) Plaintiff never received this warning because Abbonizio was notified that terminations were being implemented by Human Resources as a part of a broad initiative to review and address employee underperformance. (*Id.* ¶ 114.)

In late 2018, Defendant was undergoing a company-wide initiative to manage and drive performance. (*Id.* ¶ 115.) As part of the initiative, all employees in the cardiovascular, metabolic, and diabetes area had their performances individually reviewed to determine if they should be terminated for underperformance. (*Id.*) Tammi Gaskins, the Executive Business Director in Diabetes East at the relevant time, conducted a review of employee performance for Yescavage's District. (*Id.* ¶ 116.) Gaskins was assisted by Tina Hill, Human Resources Business Partner, and Lynnsie Peterson, Senior Director, Human Resources, Cardiovascular, Metabolic, Diabetes US Sales and Marketing Team. (*Id.*) Rod Wooten, former Senior Vice President, US Cardiovascular and Metabolic Diseases, was Gaskins' manager who also reviewed and approved the selection of those in Yescavage's area, including Plaintiff, who were selected for termination. (*Id.* ¶ 117.) In assessing employee performance and selection for termination, Wooten and Gaskins looked at

employees' past and trending performance, Circle of Excellence ("COE") sales performance, and ratings from the annual review process. (*Id.* ¶ 119.)

In 2015-2018, AstraZeneca had a performance rating scale of a 1-5 with "1" being the lowest and "5" being the highest. (*Id.* ¶ 120.) During the relevant timeframe, yearly performance evaluations for a PSS were written by their direct manager, the District Sales Manager ("DSM"). (*Id.* ¶ 121.) For Woods, Yescavage wrote her review and assigned a numerical rating for the periods he was her manager. (*Id.*) All ratings needed to be approved by the DSM's manager, the Commercial Business Director ("CBD"). Barton was Yescavage's CBD. Barton then had the ratings for her region approved and "calibrated" by her manager, Gaskins, who had final approval of ratings numbers for her entire area. (*Id.*)

Hill testified that employees with a 2.67 average performance rating over the time period of 2015-2017 and were projected to be in the bottom 25% of the COE for 2018 were identified as underperforming and their objective data was provided by Hill to Peterson, Wooten and Gaskins.[3] (Doc. 40 ¶ 122.) Gaskins and Wooten were also able to determine 2018 projected performance by reviewing the COE results for the first half of 2018 and having discussions with the Commercial Business Directors (in Wood's case Barton) about trending 2018 performance. The CBDs were not told about the potential terminations and

---

[3] Hill explained that a 2.67 average "basically means that over a three year period [the employee] had a 2 or a 1, so anything under a 3." (Hill Dep.54:21-23 (Doc. 47-8).) Plaintiff denied Defendant's averment in paragraph 122, stating that "[e]mployees with an overall performance rating of under '3' were considered sustained underperformers." (Doc. 47-1 ¶ 122.) Based on Hill's explanation of the 2.67 average, the Court finds no disagreement between the parties regarding the 3-year average score considered in the evaluation undertaken by Defendant.

were led to believe they were updating the business leaders on performance as part of the 2018 evaluation process.  (Doc. 40 ¶ 123; Doc. 47-1 ¶ 123.)  Not every employee who had a 2.67 average performance rating was ultimately terminated—exceptions were made by Gaskins and Wooten if the employee was trending positively or if extenuating circumstances impacted the employee's performance.[4]  (Id. ¶ 124.)

In Yescavage's district, three employees were terminated—Plaintiff, Sheila Cleveland, and Megan Gavin.  (Doc. 40 ¶ 125; Doc. 47-1 ¶ 125.)  Plaintiff testified that her sales performance in 2017 was not good and that she was in the bottom 5% of the Company when she received a "2" rating in 2017.  (Doc. 40 ¶ 127; Doc. 47-1 ¶ 127.)  (Plaintiff's rating of "2" in 2017 gave her an average score of 2.67.  (Doc. 40 ¶ 126.))  Plaintiff was also in the bottom 25% of the COE for 2018.  (Doc. 40 ¶ 129; Doc. 47-1 ¶ 129.)  Cleveland received a "2" on her 2015 performance review, a "3" on her 2016 review, and "2" in 2017 (a 2.33 average) and was trending for a "2' in 2018.  (Id. ¶ 131.)  Cleveland was also in the bottom of the COE ranking in 2017 and 2018.  (Id. ¶ 132.)  Gavin, who started working for Defendant in 2017, received a score of "2" on her 2017 performance evaluation and was trending for a "2" in 2018.  (Id. ¶ 133.)

Angie Peck, who was not selected for termination, scored a "2" in 2015, "3" in 2016, and "3" in 2017.  (Id. ¶¶ 134, 135.)  In 2018, Peck received a score of "4."  (Id. ¶ 136.)

---

[4] Plaintiff denied this assertion.  (See Doc. 47-1 ¶ 124.)  However, her basis for doing so was the alleged discrepancy between a 2.67 rating and a rating below 3 which, as explained in Note 4, is not a basis for disagreement.

Sheeley received a score of "3" in 2015 and 2016, and "2" in 2017.  (*Id.* ¶ 137.)

Yescavage stated that Sheeley's performance in 2017 was impacted by accessibility issues

in his territory.  (*Id.* ¶ 138.)  He received a "3" on his 2018 performance evaluation.  (*Id.* ¶

139.)

Yescavage and Barton informed Plaintiff of her termination in November 2018 and

offered her a mutual consent individual severance package.  (*Id.* ¶ 142.)  The severance

package provides that employees terminated pursuant to a mutual consent are not eligible

for rehire and the documents provided with the severance package provided to Plaintiff

stated that clearly.  (*Id.* ¶ 143.)  Plaintiff agrees that she read this information.  (*Id.* ¶ 144.)

Following her termination, Plaintiff applied for her posted position.  (*Id.* ¶ 145.)  She stated

that she did so on the advice of her attorney and recognizes that Defendant's failure to

rehire her was not retaliatory in light of the specific policy that she was not eligible for rehire.

(*Id.* ¶¶ 146, 147.)

### III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law."  *Gonzalez v. AMR*, 549

F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party, and a factual dispute

is material only if it might affect the outcome of the suit under governing law."  *Kaucher v.

County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).  Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912

(1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact.  When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of evidence." *Anderson*, 477

U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial

is usually necessary.  Finally, the Court of Appeals for the Third Circuit has

cautioned that "[s]ummary judgment is to be used sparingly in employment

discrimination cases." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir.

2008).

## IV. ANALYSIS

As noted previously, Plaintiff's Second Amended Complaint identifies four causes of action: 1) Violations of Title VII based on gender discrimination, gender stereotyping discrimination, retaliation, and hostile work environment; 2) Violations of the Americans with Disabilities Act, as Amended ("ADAAA") based on "Actual/Perceived/Record of Disability Discrimination," retaliation, failure to accommodate, and hostile work environment, 3) Violations of the Family and Medical Leave Act ("FMLA") based on interference and retaliation; and 4) Violations of the Pennsylvania Human Relations Act ("PHRA") based on gender discrimination, gender stereotyping discrimination, retaliation, hostile work environment, actual/perceived/record of disability discrimination, and failure to accommodate.  (Doc. 26 at 13-16.)

## A. **Gender Discrimination**

In its supporting brief, Defendant maintains that it has offered a legitimate non-discriminatory reason for terminating Plaintiff's employment and there is no evidence of pretext.[5]  (*See* Doc. 42 at 22-29.)   Plaintiff responds that there is ample evidence of pretext.  (Doc. 47 at 29.)

---

[5] Title VII of the Civil Rights Act of 1964 and the PHRA both prohibit an employer from discharging an employee based on the employee's membership in certain protected categories, including gender. 42 U.S.C. § 2000e–2(a); 43 P.S. § 955(a). There is no need to treat the Title VII and the PHRA claims separately, because the PHRA is construed consistently with Title VII. *See Gomez v. Alleg hen y Health Servs., Inc.,* 71 F.3d 1079, 1083–84 (3d Cir.1995); *Edridge v. Municipality of Norristown,* 514 F. App'x 187, 189 n. 2 (3d Cir.2013).

To prove a gender discrimination claim when, as here, there exists no direct evidence of discrimination, a plaintiff must satisfy the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03 (1973). *See Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir.2013).

> *McDonnell Douglas* requires the plaintiff to shoulder the initial burden to make out a *prima facie* case of discrimination. If the plaintiff meets this requirement, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory rationale for the employment action. Should the defendant satisfy its burden, the presumption of discriminatory action is rebutted and the plaintiff must demonstrate that the defendant's stated reasons are pretextual.

*Wood v. Univ. of Pittsburgh,* 395 F. App'x 810, 814 (3d Cir.2010) (citing *Wishkin v. Potter,* 476 F.3d 180, 185 (3d Cir.2007)).

At the first step, a plaintiff must establish a *prima facie* case of gender discrimination by demonstrating that: (1) they were members of a protected class; (2) they were qualified for their positions; (3) they suffered adverse employment actions; and (4) members of the opposite sex were treated more favorably. *Burton,* 707 F.3d at 426.

Defendant asserts that even if Plaintiff can establish a prima facie case of discrimination, her Title VII gender claim fails because it had a legitimate reason for Plaintiff's termination and Plaintiff cannot show that the reason was a pretext for discrimination. (Doc. 42 at 22-29.) Because Defendant assumes *arguendo* that Plaintiff can establish a prima facie case, Defendant focuses on the second and third steps of the analysis.

At the second stage, the burden of production shifts from Plaintiff to Defendants to proffer a legitimate non-discriminatory reason for the furloughs. *See Burton,* 707 F.3d at 426. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (internal quotation marks omitted). "At this stage, the 'defendant need not prove that the articulated reason actually motivated its conduct." *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir.2003)).

According to Defendant, its

decision to terminate Plaintiff's Ms. Woods' employment for underperformance was based on its legitimate business interest in addressing employee underperformance. AstraZeneca reviewed the performance of all employees in the BioPharmaceuticals Business Unit in late 2018 and terminated employees with documented and sustained underperformance. (SOF ¶ 115) The review of these employees considered objective annual sales performance. (SOF ¶ 122) Employees who received a cumulative rating of 2.67 in the years 2015, 2016, and 2017 were considered for termination. (SOF ¶ 122) Ms. Gaskins then reviewed each employee's trending performance for 2018, as well as behaviors related to core values, to determine termination. (SOF ¶ 119) If the employee's sales and performance were trending positively for 2018 – the employee was in the top 75% of the COE or trending towards a rating of "3" or higher in 2018 – he or she was not terminated. (SOF ¶ 122-4). If an employee was not demonstrating underperformance of a 2.67 average rating for 2015, 2016, 2017 and trending positively for 2018, he or she was not considered for termination even if he or she had other behaviors affecting his or her performance. (*See id.*) The baseline to be considered for termination was always the objective performance criteria.

(Doc. 42 at 23-24.)

The foregoing explanation satisfies Defendant's burden at this stage.  If true, it "would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton,* 707 F.3d at 426.  Plaintiff does not argue otherwise.  (*See* Doc. 47 at 29.)

"The third step in the *McDonnell Douglas* analysis shifts the burden of production back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton,* 707 F.3d at 426. "The plaintiff must make this showing of pretext to defeat a motion for summary judgment." *Id.* "To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 427 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)).  The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal quotation omitted).

Plaintiff proffers numerous arguments in support of her position that Defendant's stated rationale for her termination is a pretext for gender discrimination.  She cites the

following as evidence from which a jury could either disbelieve Defendant's proffered reason for termination or believe that invidious discrimination was more likely than not a motivating reason for her termination:

- Yescavage made degrading and offensive discriminatory comments to Plaintiff over a three-year period. (Doc. 47 at 36.)

- Plaintiff was treated differently from her male colleagues. (*Id.*)

- Barton, Abbonizio, and Gaskins were aware of Yescavage's discriminatory treatment of Plaintiff and Haile and did not do anything about it. (*Id.*)

- Yescavage's treatment of Plaintiff and Haile fostered an environment of discrimination. (*Id.*)

- Defendant applied its allegedly objective performance criteria disparately by failing to terminate Sheeley despite his poor performance ratings and rank. (*Id.* at 37.)

- Defendant has given shifting and inconsistent explanations regarding the reasons for Plaintiff's termination, at times citing call falsification issues and disputes with co-workers as part of the reason and at other times saying that these issues were *not* a reason for her termination. (*Id.* at 37-39.)

- Plaintiff was offered severance pay. (*Id.* at 39.)

In its reply brief, Defendant asserts that the reason for Plaintiff's termination has always been underperformance. (Doc. 52 at 7.) Defendant posits that Plaintiff's

call falsification and treatment of her coworkers were not the reasons for her termination, and had no bearing on the decision to terminate her employment. However, it did impact her projected performance rating for 2018. AstraZeneca planned to issue her a Final Written Warning in 2018. (SOF ¶ 126.)  The Final Written Warning clearly states that she would receive a rating of "1" for 2018.  (Exh. A, Yescavage Decl., Exh. 1. [Doc. 39-3].)  Accordingly, had she remained employed, she was going to receive a rating of "1" for 2018, her performance was trending down and she was selected for termination.

(Doc. 52 at 8.)

The Court concludes that Plaintiff has pointed to evidence from which a factfinder could disbelieve Defendant's articulated legitimate reason for termination or believe that invidious discrimination was more likely than not a motivating cause of the termination. *Fuentes*, 32 F.3d at 764.  First, although Defendant states that call falsification and coworker treatment "had no bearing on the decision to terminate" Plaintiff, the explanation concludes that these considerations contributed to her rating of "1" in 2018 and this was why she was selected for termination. (*See* Doc. 52 at 8.)  If not contradictory, this statement is at best confusing.

A review of testimony on this issue does not clear up the confusion.  Plaintiff testified she was told she was being terminated for her performance over the past two years which she believed to be 2017 and 2018; call falsification and coworker treatment were not mentioned.  (Woods Dep. 336:1-8, 378:10-379:5 (Doc. 47-3).)  Barton said she told Plaintiff she was being terminated for underperformance over more than one performance period. (Barton Dep. 118:1-6 (Doc. 47-5).)  Barton testified that Plaintiff was not terminated for

allegations regarding falsification of calls or interactions with colleagues.  (*Id.* 120:18-24.)

Yescavage testified that Plaintiff was not going to be terminated for the call falsification

issue.  (Yescavage Dep. 150:16-18 (Doc. 47-4).)   Peterson testified that performance over

the last three years was considered as well as sales figures for 2018 and no other factors

were considered.  (Peterson Dep. 23:5-19 (Doc. 47-7).)  She also stated that Plaintiff was

underperforming in her sales results for 2018 because they were below the 25 percent of

the sales ranking in the sales force.  (*Id.* 29:10-13.)  Peterson specifically stated that past

discipline or being under investigation were not considered and, although she learned of the

call falsification investigation, it was not one of the reasons why she decided Plaintiff should

be terminated.  (*Id.* 24:19-25:7, 35:11-39:15.)  Gaskins testified that "the definition of a two

as written . . . means that you are not meeting all the expectations of the role, which can be

both performance and behavior related."  (Gaskins Dep. 38:5-9 (Doc. 47-6).)  Gaskins

added that "[p]erformance is defined by a combination of both objective and behaviors

related to our core values . . . .  So, when you're not meeting expectations, it can be related

to one or a combination of both."  (*Id.* 38:10-16.)  After much discussion, Gaskins confirmed

that she and Wooten decided to terminate Plaintiff because she failed to meet sales

objectives and falsified calls.  (*Id.* 40:19-24.)  Wooten testified that Plaintiff was terminated

for sustained underperformance for the period evaluated and not for any other reason that

he knew of.  (Wooten Dep. 30:12-18 (Doc. 47-12.)  Wooten also testified that, regarding

trending performance, Barton had mentioned concerns about values and behaviors but he

did not know if it was a formal investigation and he did not receive any results or findings of any investigation or speak with anyone else about concerns. (*Id.* 39:1-408.)

The foregoing review demonstrates varied and, in some instances, inconsistent testimony about the reasons for Plaintiff's termination. Therefore, Defendant cannot rely on its assertion that there has been a consistent reason for Plaintiff's termination to defeat Plaintiff's argument that the reason given was a pretext for discrimination or retaliation.

Second, while Defendant maintains that Plaintiff was not treated differently from her male colleague Sheeley because Sheeley was trending positively in 2018 and extenuating circumstances had affected his 2017 performance rating (*see, e.g.*, Doc. 52 at 15), Defendant does not explain the basis for the assessed positive trending in 2018. This omission is noteworthy given that Sheeley's territory was in the bottom 10% of the COE rankings as of October 2018, an indicator of negative trending for the year according to Defendant, *see supra* p. 16. (*See* Doc. 49-3 at 2.)

Further, Defendant provides no meaningful assessment of extenuating circumstances related to Plaintiff's performance although the record arguably supports a finding that personal and professional extenuating circumstances contributed to her 2017 End of Year Review rating of "2" which brought her performance into the underperforming range. In its Statement of Facts, Defendant asserts that "there were no extenuating circumstances surrounding Ms. Woods performance that would justify making an exception to her selection for termination such as an upward trend in her sales numbers in 2018 or

territory access issues that were impacting numbers." (Doc. 40 ¶ 130 (citing Gaskins Dep. 53:1-17).)   In opposition to Defendant's assertion, Plaintiff notes that she was performing better than Sheeley when she was selected for termination. (Doc. 47-1 ¶ 130.) Notably, a review of the testimony which Defendant relies on to support its assertion in paragraph 130 does not do so: Gaskins did not state that there were no extenuating circumstances in Plaintiff's situation. Rather, she stated generically that they looked at whether the underperforming individual was going in a better direction for 2018 and if there had been any specific challenges in a give area. (Gaskins Dep. 53:4-8.) Similarly, Defendant improperly relies on Gaskins' testimony to support a footnote regarding extenuating circumstances in the retaliation section of its supporting brief which states that "Ms. Woods behaviors were all negative, thus, there were no extenuating circumstances to offset her original identification as an underperformer" (Doc. 42 at 19 n.4).

Though unsupported, Defendant's statements indicate that, for the 2017 End of Year Review which occurred before any negative behaviors had been identified, decisionmakers did not consider extenuating circumstances which may have impacted Plaintiff's 2017 score of "2." As noted above, the record arguably supports a finding that extenuating circumstances existed for that year, the year in which Defendant found that extenuating circumstances contributed to the decision not to terminate Sheeley.

Relevant to the 2017 End of Year review, the record shows that Plaintiff began a medical leave of absence in late December 2016 when she was approximately seven

months pregnant, had her second child in January 2017, and remained out of work on maternity leave until April 24, 2017.  (Doc. 26 ¶¶ 30-31; Doc. 48-4 at 4.)  Therefore, Plaintiff's COE performance rank of 1222 for the first quarter of 2017 is reflective of her absence from her job (and the coverage provided by her partners) rather than her performance on the job.  (*See* Doc. 48-4 at 2, 4.)  Though Defendant asserts that peer coverage means there should be no impact on sales when a PSS is out on leave,[6] in reality Plaintiff's assessed sales performance for the period of her absence was that of the covering PSS.

From the professional/business perspective, Yescavage stated in the 2017 End of Year Review that "[t]he territory struggled to grow the portfolio and was hampered by underperformances of Bydureon and no growth during the market event with a competitor for Farxiga."  (Doc. 48-4 at 2.)  Yescavage also noted that Plaintiff was responsible for mentoring a new hire during the year.  (*Id.*)  He concluded that "[f]rom a performance standpoint, the territory fell behind and could not catch up."  (*Id.*)

In sum, numerous factual propositions support an inference that extenuating circumstances affected Plaintiff's performance in 2017: 1) Plaintiff's absence from work for

---

[6] In its Statement of Undisputed Material Facts, Defendant states that "Ms. Woods was not disciplined for taking FMLA leave.  When a PSS is on medical leave, his or her PSS partner(s) in the field cover the same customers so there should be no impact on sales numbers."  (Doc. 40 ¶ 33 (citing Woods Dep. 69:24-70:14; 293:19-294:9).)  The cited deposition testimony establishes that PSS partners cover for an employee who is out on leave.  (Woods Dep. 69:24-70:14 (Doc. 47-4).)  Importantly, Plaintiff did not testify that there should be no impact on sales numbers because of the coverage.  As discussed in the text, the Court's analysis of Plaintiff's 2017 End of Year Review indicates that the sales numbers of an individual who is out on leave may be impacted although customer coverage is provided.

the first third of 2017 arguably diminishes her responsibility for problems within the territory; 2) Plaintiff is not responsible for her sales rank of 1222 for the first quarter of 2017; 3) there were problems out of Plaintiff's control related to two drugs for which she was accountable, Bydureon and Farxiga; 4) there was a new hire in the territory in 2017 which potentially affected territory performance; and 5) Yescavage assessed that the territory fell behind and could not catch up which was not an assessment of Plaintiff's personal performance. Defendant does not shed any light on why extenuating circumstances concerning Plaintiff's 2017 score of "2" were not mentioned by Ms. Barton when she spoke with the named decision-makers about Plaintiff.  Nor does Defendant provide a rationale for why the named decision-makers themselves did not find that extenuating circumstances contributed to Plaintiff's 2017 score of "2" which put her into the underperforming category.

The foregoing discussion points to issues material to the questions of disparate treatment and pretext which preclude summary judgment on Plaintiff's gender discrimination claim.

Considering the review process from the "extenuating circumstances" perspective highlights the subjective component of the termination decisions.  While Defendant posits that objective criteria were used in the review process (*see, e.g.*, Doc. 52 at 8 n.4, 21), the fact that performance evaluations completed by employee supervisors formed the basis of an employee's numerical scores for 2015, 2016, and 2017 points to the underlying subjective component of the process.  Further, the fact that trending 2018 performance

information (beyond COE data) and potential extenuating circumstances not identified in the

performance reviews could only come from direct knowledge of the employee's

performance leads to the conclusion that the named decisionmakers relied on the subjective

evaluations of those in the employee's direct supervisory line.

Not only is Defendant's objectivity argument undermined by the inherent recognition

that others participated in the decision to terminate certain employees, the argument is

directly contradicted by Rodney Wooten, former AstraZeneca senior vice-president, US

Cardiovascular and Metabolic Diseases, who reviewed and approved the selection for

termination of Plaintiff and others.  (*See* Doc. 40 ¶ 117.)  When asked at his deposition who

made the decision to terminate Plaintiff, Wooten responded that "Miss Woods was part of a

performance evaluation that we did as an organization, so her direct manager.  But it's part

of a process."  (Wooten Dep. 27:2-6 (Doc. 47-12).)  Wooten confirmed that Yescavage was

Plaintiff's manager when she was terminated.  (*Id.* 27:20-22.)  Ms. Gaskins' testimony also

indicates a subjective component of the performance review process and trending 2018

performance considerations.  (Gaskins Dep. 38:10-16 ("[p]erformance is defined by a

combination of both objective and behaviors related to our core values).)

It is well-recognized that the animus of an employee who was not the ultimate

decisionmaker is relevant if that individual influenced the decisionmaker.  *McKenna v. City

of Philadelphia*, 649 F.3d 171 (3d Cir. 2011) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411

(2011); *Jones v. SEPTA*, 796 F.3d 323, 330 (3d Cir. 2015) (discussing *McKenna's*

extension of *Staub's* "cat's paw" theory of liability to Title VII context). "The Supreme Court has clarified that in 'cat's paw' cases the relevant question is whether a bias-motivated action was the proximate cause of the ultimate employment action." *Smith v. Comhar, Inc.*, 722 F. App'x 314, 318 (3d Cir. 2018) (citing *Staub v. Proctor Hosp.,* 562 U.S. 411, 422 (2011)). Proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect.'" *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 330 ((3d Cir. 2015) (quoting *Staub*, 562 U.S. at 419).

Within this legal framework, Wooten's acknowledgement that Yescavage played a role in the decisionmaking at the very least supports the potential viability of a "cat's paw" theory of discrimination. A review of Plaintiff's allegations regarding Yescavage's conduct further supports a finding that Defendant is not entitled to summary judgment on this claim.

Plaintiff's assertions regarding Yescavage's discriminatory comments (corroborated in part by the Certification of Amanda Haile (Doc. 47-16)) and Defendant's differing assertions (*compare* Doc. 40 ¶¶ 46-47 *with* Doc. 47-1 ¶¶ 46-47) create genuine issues of material fact which preclude summary judgment. For example, Defendant avers that Plaintiff's claimed discrimination in her January 2018 complaint included a statement by Yescavage while she was pregnant in 2016, at which time he stated "you're not going to last. I'm going to have to get someone else to help you." (Doc. 40 ¶ 46.) In response, Plaintiff avers that the statement identified by Defendant was not the extent of her complaint

and she gave more information regarding Yescavage's comments and treatment, including

the following:

> Yescavage also told Ms. Woods, "with your medical issues, with your medical leave, you're not going to last. There's no way." Exhibit B at p. 67:1-7; 206:2-8. He also told her that he was going to have to hire more people in case "you decide to have another baby or get sick again." Exhibit B at p. 68:17-24; 69:1-3, 20-23. He went on to tell Ms. Woods, "I had to hire Megan and Len to help you in case you decide to have another child or go out again on leave or get sick again." *Id.* He also said things about Ms. Woods such as, "oh, she's sick again"; "oh, what if she has another baby." Exhibit B at p. 109:11-24; 110:1-11. He also told Ms. Woods that her "kids are always sick." Exhibit B at p. 72:5-12. Also, in January 2018, Mr. Yescavage gave Ms. Woods, Ms. Haile and Ms. Peck (all females with young children) an article titled "How to Handle Work When Your Child Is Sick." Exhibit B at p. 216:3-15; Exhibit C at p. 52:16-22; 53:1-2; 64:2-8; Exhibit W. Yescavage also specifically referenced Ms. Woods' use of FMLA/maternity leave in both her 2015 and 2017 performance evaluations. Exhibit O; Exhibit Q.

(Doc. 47-1 ¶ 46.)  Defendant contends that the comments about needing to hire someone to

help Plaintiff were made when Yescavage was replacing Woods' territory partner after the

former partner resigned.  (Doc. 40 ¶ 47.)  Plaintiff agrees that Yescavage made the

statement at that time but adds that it was not the only time he made that type of comment.

(Doc. 47-1 ¶ 47.)  Defendant does not argue that comments allegedly made by Yescavage

regarding pregnancy or having another child could not be construed as comments exhibiting

discriminatory gender animus.

The foregoing analysis indicates that there are disputed issues related to the review

process, to Yescavage's conduct related to Plaintiff, and to whether discriminatory animus

played a role in Yescavage's performance evaluations of Plaintiff and the failure to identify

extenuating circumstances related to Plaintiff's performance. Drawing Inferences in the light most favorable to the non-moving party, *Big Apple,* 974 F.2d at 1363, the Court concludes that Plaintiff has provided evidence from which a factfinder could reasonably infer that Defendant's proffered justification for her termination is pretextual, *see Burton,* 707 F.3d at 426. Therefore, Defendant's Motion is properly denied as it relates to gender discrimination.[7]

**B.    Disability Discrimination**

In support of its Motion related to Plaintiff's disability claims, Defendant avers that no reasonable factfinder could conclude that it discriminated against Plaintiff because of a disability.[8] (Doc. 42 at 5.) The *McDonnell Douglas* framework set out above applies to Plaintiff's disability discrimination claim. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).

To make out a prima facie case of disability discrimination under the ADA, a plaintiff must establish that she "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006) (citing *Buskirk v. Apollo Metals,* 307 F.3d 160, 166 (3d Cir.2002); *Gaul v. Lucent Techs. Inc.,* 134 F.3d 576, 580 (3d Cir.1998)).

---

[7] Defendant's supporting brief does not address Plaintiff's Title VII claim based on gender stereotyping discrimination. (*See* Doc. 42; Doc. 26 at 13.)

[8] With possible exceptions not relevant here, *see, e.g., Sharbaugh v. West Haven Manor, LP,* Civ. A. No. 14-1723, 2016 WL 6834613, at *6-7 (W.D. Pa. Nov. 21, 2016), the PHRA is construed in accordance with the ADA. *Gagliardo v. Connaught Laboratories*, 311 F.3d 565, 568 n.2 (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

### 1. Disability

Defendant first asserts that Plaintiff has not established that she had a disability. (Doc. 42 at 6.)  Plaintiff responds that she has suffered from migraines, hypertension, and gastrointestinal conditions for many years and these conditions have interfered with and limited her daily functioning.  (Doc. 47 at 48.)  The Court concludes Defendant has not shown that there are no genuine issues of material fact related to this issue.

"To satisfy the requirement of having a 'disability' a plaintiff may demonstrate any one of: an actual mental or physical impairment that substantially limits one or more major life activities, a record of such impairment, or that his employer regarded him as having a disability." *Macfarlan v. Ivy Hil SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012).  The ADA Amendments Act ("ADAAA") contains sweeping language which provides that the ADA "'shall be construed in favor of broad coverage of individuals' and expanded the rules of construction governing the definition of disability." *Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC*, 58 F. Supp. 3d 446, 460 (M.D. Pa. 2014) (quoting ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4(a), 122 Stat. 3553, 3555).

Defendant maintains that Plaintiff's ADA discrimination claim fails because she "has not demonstrated that she suffered from a disability separate and apart from the conditions related to her pregnancies." (Doc. 42 at 7.)  Defendant relies on numerous district and state court cases to support its conclusion:

> Pregnancy is not a disability under the ADA or the PHRA. *Ahern v. Research Tech., Inc*., 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016). Although pregnancy-

related complications may constitute a disability, the complications must substantially limit a major life activity. *See* 29 C.F.R. Pt. § 1630, App. § 1630.2(h). A plaintiff must do more than simply "recite[ ], in talismanic fashion, that some [pregnancy] complications" occurred in order to allege a disability. *Oliver v. Scranton Materials, Inc.*, No. 3:14-CV-00549, 2015 WL 1003981, at *8 (M.D. Pa. Mar. 5, 2015). Rather, she must establish that she had some disability separate and apart from her pregnancy. *See Brennan v. Nat'l Tel. Directory Corp.*, 850 F. Supp. 331, 344 (E.D. Pa. 1994); *Trans World Airlines*, 44 Pa. Cmwlth. 341, 346–47, 403 A.2d 1057, 1060 (1979); *see, e.g. Gudenkauf v. Stauffer Communs., Inc.*, 922 F. Supp. 465, 474 (D. Kan.1996) (holding that typical complications of pregnancy, including morning sickness, do not constitute a disability); *Minott v. Port Auth. of N.Y. & N.J.*, 116 F. Supp. 2d 513, 525 (S.D.N.Y. 2000) (noting that "only in extremely rare circumstances" will complications arising from pregnancy constitute a disability and holding that plaintiff who suffered pregnancy-related complications and miscarried was not disabled).

(Doc. 42 at 7.)

Based on the foregoing authority, Defendant asserts that Plaintiff has failed to show

that her migraines, hypertension, and gastrointestinal problems

are more than temporary, routine complications that may arise from pregnancy. 42 U.S.C. § 12101 *et seq.* ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities."). She admits that she has not received treatment for any of these conditions since at least 2018. (SOF ¶¶ 25-7). While she states that she gets migraines every once in a while, she admitted she does not take any medication to treat them. (SOF ¶ 26). She also fails to produce any evidence of how these conditions substantially limited one or more major life activity. For this reason alone, the Court must dismiss Ms. Woods' claims under the ADA.

(Doc. 42 at 8.)

The problem with Defendant's argument is both legal and factual.  Legally, many of

Defendant's cited cases predate the ADAAA which advised that the ADA should be

construed in favor of broad coverage and expanded the rules of construction governing the

definition of disability, *see supra* p. 22.  Moreover, *Oliver*, a 2015 decision of this Court,

does not undermine Plaintiff's entitlement to coverage.  To the defendant's argument that

the plaintiff's pregnancy was not a disability under the ADA and the plaintiff's argument that

her ADA claim was based on medical complications associated with her high-risk pregnancy

and the need for surgery at the time of birth, the Court reasoned as follows:

> Under the ADAAA "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the [ADAAA]." *Id.* at § 12102(4)(B). Congress stated that its intent in passing the ADAAA included "convey[ing] that the question of whether an individual's impairment is a disability under the ADA should not require extensive analysis" and that the then-existing standard that courts applied to the term "substantially limits" had "created an inappropriate high level of limitation necessary to obtain coverage under the ADA." *See* Pub. L. 110–325, 122 Stat. 3553, § 2(b)(5). Thus, the relevant regulations now provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment." *Id.* at § 1630.2(j)(1)(iv). Moreover, the Regulations now specifically provide that "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." *Id.* at § 1630.2(j)(1)(ix). Thus, while pregnancy by itself may not constitute a disability under the ADA, *see, e.g., Brennan v. Nat'l Tel. Directory Corp.,* 850 F. Supp. 331, 333 (E.D. Pa.1994), courts interpreting the Act in light of the 2008 amendments have found that *complications arising out of pregnancy* can constitute disability sufficient to invoke the ADA, and that whether they actually rise to the level of disability is a question of fact. *See, e.g., Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 2013 WL 121838, at *2–3 (S.D. Ind.2013); *Mayorga v. Alorica, Inc.,* 2012 WL 3043021, at *5 (S.D. Fla.2012) (collecting cases); *see also Darian v. Univ. of Massachusetts–Boston,* 980 F, Supp. 77, 85 (D. Mass.1997) (pre-ADAAA case, noting that "[b]y its terms, though pregnancy *per se* is not covered by the ADA, the Act does not necessarily exclude all pregnancy-related conditions and complications").

In light of this background, the Court cannot find that Plaintiff's alleged "pregnancy-related complications" do not give rise to an ADA claim as a matter of law. However, the Complaint does not specify what "complications" and "surgery" Plaintiff actually experienced, but only recites, in talismanic fashion, that some complications and surgery occurred. (*See* Compl. at ¶¶ 16, 18, 33.) When Plaintiff does not provide the Court with any indication of what occurred to support her disability allegations, the Court cannot engage in the necessary "individualized assessment" to determine whether she can state a claim under the ADA. Her pleadings constitute a paradigmatic example of a "formulaic recitation of a cause of action's elements" that does not state "the grounds of [Plaintiff's] entitlement to relief."

*Oliver*, 2015 WL 1003981, at *7–8. In those circumstances, the Court concluded that dismissal of the plaintiff's ADA claim based on generically pled pregnancy complications was appropriate.

In contrast, here Plaintiff's operative complaint specifically identifies the conditions upon which her disability claim is based—migraines, hypertension, and gastrointestinal conditions. (*See, e.g.*, Doc. 26 ¶ 32.) She avers that she was required to take medication, miss time from work and sometimes be hospitalized because of these conditions and she requested FMLA intermittent leave in relation to the conditions.[9] (*Id*. ¶¶ 33-34.)

_____

[9] The parties agree that Plaintiff was last treated for hypertension in 2018 but disagree as to her treatment for migraines: as of October 13, 2020, when Defendant filed its Statement of Undisputed Material Facts, Defendant states that Plaintiff was last treated for migraines "several years ago" while Plaintiff avers that she continued to receive treatment for migraines through 2018 and continues to suffer from migraines as much as once a week. (Doc. 40 ¶ 26; Doc. 47-1 ¶ 26.) While Defendant states that Plaintiff was not diagnosed with any specific medical condition that would cause these issues (Doc. 40 ¶ 28), Plaintiff responds that she "was diagnosed with and has obtained medical treatment for migraines and hypertension from 2015 to 2018 and to date, continues to suffer from these conditions, which affect and interfere with her daily functioning" (Doc. 47-1 ¶ 28).

Not only are the circumstances of this case factually distinguishable from those in *Oliver* where the Court dismissed the ADA claim without prejudice and with leave to amend, Defendant's statement that Plaintiff "has not received treatment for any of [the alleged] conditions since 2018" (Doc. 42 at 8) irrelevant: because Plaintiff was terminated in November 2018, she received treatment during the relevant time.  Finally, although Defendant states that Plaintiff also fails to produce any evidence of how her conditions substantially limited one or more major life activities (*id.*), Plaintiff argues that her medical conditions limit her "daily functioning, including concentration, focus, vision, and, at times, work." (Doc. 47-1 ¶ 23.)  The Court finds these assertions to be acceptable evidence of the limitations of her conditions based on the implementing regulations of the ADAAA:

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

29 C.F.R. § 1630.1; *see also* 29 C.F.R. § 1630.2 ("Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."); *Kessler v. AT&T*, No. 3:13-CV-00207, 2015 WL 5598866, at *6 (M.D. Pa. Sept. 22, 2015).

The foregoing discussion indicates that a reasonable jury could conclude that Plaintiff was disabled within the meaning of the ADA.  Therefore, the Court proceeds to the second prong of the inquiry, i.e., whether Plaintiff was a "qualified individual."

**2. Qualified Individual**

Rather than addressing whether plaintiff was a "qualified individual," Defendant

contends that Plaintiff did not request an accommodation and was provided every leave

requested.  (Doc. 42 at 10.)

As explained in *Turner*,

> [a] "qualified individual" is defined as one "who, with or without reasonable
> accommodation, can perform the essential functions of the employment
> position that such individual holds or desires." 42 U.S.C. §
> 12111(8); *Buskirk,* 307 F.3d at 168. The EEOC regulations divide this inquiry
> into two parts: (1) whether the individual has the requisite skill, experience,
> education and other job-related requirements of the position sought, and (2)
> whether the individual, with or without reasonable accommodation, can
> perform the essential functions of that position. 29 C.F.R. §
> 1630.2(n); *Buskirk,* 307 F.3d at 168. The determination of whether an
> individual with a disability is qualified is made at the time of the employment
> decision, and not at the time of the lawsuit. *Gaul,* 134 F.3d at 580.

440 F.3d at 611.

Defendant does not dispute that Plaintiff had the requisite skill, experience,

education and other job-related requirements of her position and that she could perform the

essential functions of that position.  Plaintiff asserts that she was qualified to perform her job

with the reasonable accommodation of needing some time off because of her medical

conditions.  (Doc. 47 at 48-49.)  In stating that Plaintiff never made a request for a disability-

related accommodation (Doc. 42 at 10), Defendant does not initially acknowledge that

requesting time off can be considered an accommodation.  *Scopelliti v. Traditional Home*

*Health & Hospice*, No. 3:18-CV-40, 2020 WL 2850905, at *7 (M.D. Pa. June 2, 2020)

(citing *Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 585 (3d Cir. 2004)

(holding that federal courts have considered leaves of absence to be reasonable

accommodations if it would allow the employee to return to work in the near future).  With its

alternative argument that Plaintiff's requests for leave related to her pregnancies and related

conditions, to the extent considered requests for accommodation, are duplicative of her

FMLA interference claim, Defendant does not provide authority which precludes Plaintiff

from proceeding under both theories.  (*See* Doc. 42 at 11.)   Therefore, the Court will

address whether Plaintiff has provided evidence that she has suffered an adverse

employment action because of that disability.

### 3. Adverse Employment Action

Defendant maintains that Plaintiff fails to establish that her alleged disability caused

her termination.  (Doc. 42 at 8.)

To establish causation in a pretext case, a plaintiff must show that consideration of a

protected characteristic was a "determinative factor" in the plaintiff's adverse employment

action.  *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir. 2000); *see also Fiorentini v. William

Penn Sch. Dist.*, 665 F. App'x 229, 237 (3d Cir. 2016).  The Third Circuit recently set out the

relevant test: a determinative factor is one which had a determinative effect on the adverse

employment action such that the adverse decision would not have occurred in the absence

of the protected trait or conduct. [10] *Laurora v. Bayer Corp.*, No. 21-2764, 2022 WL 4093738, at *5 (3d Cir. Sept. 7, 2022) (citing *Egan v. Del. River Port Auth.*, 851 F.3d 263 n.1 (3d Cir. 2017) (citing *Miller v. CIGNA Corp.*, 47 F.3d 586, 597 (3d Cir. 1995))).

In asserting that Plaintiff cannot meet the determinative factor test, Defendant first states that there is no evidence that Ms. Gaskins was aware of or considered any disability Plaintiff may have had in selecting her for termination.  (Doc. 42 at 9.)  As discussed in the

---

[10] There has been some discussion of whether the ADAAA replaced the narrower determinative factor test with the motivating factor test. Magistrate Judge Martin C. Carlson recognized this issue in *Scopelliti v. Traditional Home Health & Hospice*, No. 3:18-CV-00040, 2019 WL 8955168 (M.D. Pa. Dec. 4, 2019), Report and Recommendation adopted as modified, No. 3:18-CV-40, 2020 WL 2850905 (M.D. Pa. June 2, 2020), where he quoted *Sharbaugh v. West Haven Manor, LP*, Civ. A. No. 14-1723, 2016 WL 6834613, at *6-7 (W.D. Pa. Nov. 21, 2016).

"The ADAAA made two significant changes to the ADA; first, the ADAAA expanded the definition of the term disability, which had been narrowed by Supreme Court precedent; and second, the ADAAA changed the language of § 12112(a) to prohibit discrimination against a qualified individual "on the basis of" a disability, instead of "because of" a disability. Pub. L. No. 110-325, §§ 2(b)(1)-(6), 3(2)(a), § 4(a), 122 Stat. 3553, 3555; *Kravits v. Shinseki*, No. 10-861, 2012 U.S. Dist. LEXIS 24039, 2012 WL 604169, at *6 (W.D. Pa. Feb. 24, 2012). The first change made it easier for an employee to prove that he or she was "a disabled person" under the ADA. The second change arguably replaced the more narrow determinative factor, or but-for, causation test with the less-exacting and more plaintiff-friendly motivating factor test. *Graesslin v. Duluth Trading Co.*, No. 14-359, 2015 U.S. Dist. LEXIS 67352, 2015 WL 2449588, at *7 n.8 (W.D. Wis. May 22, 2015)."

*Scopelliti*, 2019 WL 8955168, at *7 n.5 (quoting *Sharbaugh*, 2016 WL 6834613, at *6-7).

Magistrate Judge Carlson determined that the broader interpretation properly guided his analysis recognizing that the Interpretive Guidance provides that "the term 'major' shall not be interpreted strictly to create a demanding standard for disability." 2019 WL 8955168, at *7 n.5 (quoting 29 C.F.R. § 1630.2(i)(2); citing *McGinley v. City of Allentown*, 2012 WL 4849250 (E.D. Pa. Feb. 7, 2012). However, the Third Circuit Court of Appeals continues to apply the determinative factor test to establish causation in a disability discrimination pretext case.  *Fiorentini v. William Penn School District*, 665 F. App'x 229, 237 (3d Cir. 2016); *see also* Third Circuit Court of Appeals Model Civil Jury Instruction 9.1.2.  Therefore, this Court will do the same.

context of Plaintiff's gender discrimination claim, it is well-recognized that the animus of an

employee who was not the ultimate decisionmaker is relevant if that individual influenced

the decisionmaker.  *See supra* p. 23.  This also applies to a disability discrimination claim.

*Macknet v. University of Pennsylvania*, 738 F. App'x 52, 57 (3d Cir. 2018).  Thus,

Yescavage's alleged animus is relevant in the current inquiry.  Because comments

purportedly made by Yescavage involved Plaintiff's medical conditions, Defendant has not

shown that a reasonable factfinder could not find that the comments exhibit discriminatory

animus based on disability.  Therefore, Yescavage's discriminatory animus is a material

issue in dispute for the reasons discussed at length in the preceding section of this

Memorandum Opinion.  Accordingly, the question whether discriminatory animus based on

disability was a determinative factor in Plaintiff's termination cannot be resolved as a matter

of law on the current record.  Therefore, Defendant has not met its burden of showing there

is no genuine issue of material fact regarding causation.

Proceeding to the pretext phase of the *McDonnell Douglas* analysis, summary

judgment must be denied on Plaintiff's disability discrimination claim for reasons similar to

those found to preclude summary judgment on the gender discrimination claim.

Specifically, a reasonable jury could disbelieve Defendant's proffered reason or believe that

an invidious discriminatory reason was more likely than not a determinative cause of

Plaintiff's termination, *Fuentes,* 32 F.3d at 764, based on the following: (1) the Court's

finding that Defendant cannot rely on its assertion that there has been a consistent reason

for Plaintiff's termination to defeat Plaintiff's argument that the reason given was a pretext for discrimination or retaliation, *see supra* p. 19; (2) the question of why extenuating circumstances, admittedly a part of the evaluation process, *see supra* pp. 9-10, were not discussed or found as to Plaintiff's 2017 performance review when she missed approximately one-third of the year because of approved leave, *see supra* pp. 20-21; (3) questions related to the subjectivity of the performance evaluations, *see supra* pp. 21-22; and (4) the potential applicability of the cat's paw theory of liability and Yescavage's alleged discriminatory animus, *see supra* pp. 22-24.

For the foregoing reasons, Defendant's Motion is properly denied as to Plaintiff's disability discrimination claim.[11]

## C. FMLA Interference Claim

Defendant states that Plaintiff's FMLA claim fails as a matter of law because her concession that she was granted every request for leave precludes her establishing all elements of her interference claim. (Doc. 42 at 23 (citing Doc. 40 ¶ 29; *Callison v. City of Philadelphia*, 430 F.3d 117, 120 (3d Cir. 2005); *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 335 (E.D. Pa. 2015), aff'd, 847 F.3d 144 (3d Cir. 2017)).

To make out a claim of interference under the FMLA, a plaintiff must establish:

"(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or

---

[11] In its supporting brief, Defendant does not address the "Perceived" and "Record of Disability" bases for her disability discrimination claim. (*See* Doc. 42; Doc. 26 at 14.)

her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."

*Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014) (quoting *Johnson v. Cmty. Coll. of Allegheny Cnty.,* 566 F. Supp. 2d 405, 446 (W.D.Pa. 2008); citing *Sommer v. The Vanguard Grp.,* 461 F.3d 397, 399 (3d Cir.2006) (noting that an interference claim requires an employee to show that he was not only entitled to FMLA benefits but that he was denied those benefits)). *Ross* explained that the *McDonnell Douglas* burden shifting analysis is not required because an FMLA interference claim is not about discrimination. 755 F.3d at 192. *Ross* also stated that "[u]nder an interference claim, 'the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision.'" *Id.* (quoting *Sommer,* 461 F.3d at 399 (alteration in original).

Defendant argues that Plaintiff cannot succeed on her FMLA interference claim: she cannot meet the requirement that the she was denied benefits to which she was entitled under the FMLA because Plaintiff was never denied FMLA benefits. (Doc. 42 at 23.) Plaintiff responds that the scope of what constitutes interference goes beyond a denial of benefits:

> [t]he scope of what constitutes interference is described in the applicable regulations as follows: "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). To have an actionable interference claim, it is not necessary that the employer actually deny FMLA leave. *Callison v. City of Phila.,* 430 F.3d at 117, 119 (3d. Cir. 2005). Rather, a plaintiff may have an actionable FMLA

interference claim where the employer takes any action that "could 'chill' desire to take FMLA leave, even when the employee takes the leave." *Grosso v. Fed. Exp. Corp.*, 467 F. Supp. 2d 449, 463 (E.D. Pa. 2006) (quoting *Sherrod v. Phila. Gas Works*, 57 Fed. Appx. 68, 73 n.6 (3d Cir. 2003)); *Kimes v. University of Scranton*, 126 F. Supp. 3d 477 (M.D. Pa. 2015); *Sabbrese v. Lowe's Home Centers, Inc.*, 320 F. Supp. 2d 311, 330 (W.D. Pa .2004) (denying summary judgment where defendant's behavior left plaintiff "without reasonable assurances that he would be permitted to exercise his FMLA rights without interference in the future"); *See Williams v. Shenango, Inc.*, 986 F. Supp. 309, 321 (W.D. Pa. 1997) (concluding that, encouraging the plaintiff to reschedule requested FMLA leave "may, in fact, constitute 'interference with' FMLA rights").

(Doc. 47 at 41-42.)

Plaintiff avers that her case is similar to *Kimes* where the Court found that a negative performance evaluation, denial of a raise, and negative comment after the plaintiff took one FMLA-qualifying day off to care for her son could chill the plaintiff's desire to take FMLA leave in the future and, as a result, a jury could find FMLA interference. (Doc. 47 at 42 (citing *Kimes*, 126 F. Supp. 3d 477).) Plaintiff asserts that the following treatment caused her to be discouraged and dissuaded from requesting/using FMLA leave: "(1) [she was] subjected to extremely disparaging comments and treatment about her need for and use of medical/FMLA leave . . . and (2) [she was] subjected to having her use of FMLA leave specifically referenced in her 2015 and 2017 performance evaluations." (*Id.*)

Defendant distinguishes *Kimes* primarily based on the assertion that the comments about Plaintiff's leave occurred in 2016 and 2017 so it is difficult to see how the comments discouraged her from taking leave in 2018. (Doc. 52 at 18.) As set out previously, Plaintiff claims that she was subject to far more than the comments identified by Defendant and that

39

Yescavage's comments continued into 2018.  (*See, e.g.*, Doc. 40 ¶¶ 29, 33, 46; Doc. 47-1 ¶¶ 29, 33, 46.)

Defendant undermines the impact of the mention of FMLA leave in her 2015 and 2017 evaluations with the observation that nothing negative was said about taking leave and the inclusion of the fact that she had done so "was noted to shed light on the gaps in her performance numbers." (Doc. 52 at 18-19.)  The Court agrees with Defendant that the 2015 and 2017 performance reviews accurately stated that Plaintiff had taken leave with no negative comment or connotation.  Therefore, mere mention of the leave cannot be seen to chill Plaintiff's desire to thereafter take FMLA leave.

However, even without identifying any negative inference from the mention of FMLA leave in the 2015 and 2017 performance reviews, Defendant has not shown as a matter of law that Plaintiff was not discouraged from taking FMLA leave as a result of Yescavage's comments and treatment.  Therefore, Defendant's Motion will be denied as to this claim.

## D. Retaliation Claims

Defendant maintains that Plaintiff cannot establish retaliation against her on any basis alleged.  (Doc. 42 at 11, 17.)  Plaintiff responds that she can establish her FMLA, ADA, Title VII, and PHRA retaliation claims.  (Doc. 47 at 49.)

Retaliation claims are cognizable under Title VII, the ADA, and the FMLA.  *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022).  Retaliation claims which rely

on circumstantial evidence are governed by the *McDonnell Douglas* analytical framework.

*Id.*

## 1. FMLA Retaliation

Defendant argues that Plaintiff's FMLA retaliation claim fails as a matter of law

because she cannot show that Defendant's reason for her termination was a pretext for

discrimination.  (Doc. 42 at 12, 17.)

"To succeed on her [FMLA retaliation] claim, it is [the plaintiff's] burden to establish

that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse

employment decision, and (3) the adverse action was causally related to her invocation of

rights.'"  *Budhun v. Reading Hosp. and Medical Center*, 765 F.3d 245, 257 (3d Cir. 2014)

(quoting *Lichtenstein v. Univ. of Pittsburgh Medical Center*, 691 F.3d 294, 302 (3d Cir.

2012); citing *Ross v. Gilhuly,* 755 F.3d 185, 192–93 (3d Cir. 2014)). Once she establishes a

prima facie case, the burden shifts to the defendant to provide evidence of a legitimate non-

discriminatory reason for the adverse action. *McDonnell Douglas,* 411 U.S. at 802.  "If the

employer meets this 'minimal burden,' the employee must then point to some evidence that

the defendant's reasons for the adverse action are pretextual."  *Budhun*, 765 F.3d at  256

(quoting *Lichtenstein,* 691 F.3d at 302).

Regarding the third element which is at issue here, *Budhun* explains that

[w]hether a causal link exists "must be considered with a careful eye to the
specific facts and circumstances encountered." *Farrell v. Planters Lifesavers
Co.,* 206 F.3d 271, 279 n. 5 (3d Cir.2000). We have been reluctant to infer a
causal connection based on temporal proximity alone. *See Weston,* 251 F.3d

at 431. To demonstrate a causal connection, a plaintiff generally must show
"either (1) an unusually suggestive temporal proximity between the protected
activity and the allegedly retaliatory action, or (2) a pattern of antagonism
coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v.
DeFlaminis,* 480 F.3d 259, 267 (3d Cir.2007). Employers "cannot use the
taking of FMLA leave as a negative factor in employment actions." 29 C.F.R.
§ 825.220(c).

*Budhun*, 765 F.3d at 258.  "The 'mere passage of time is not legally conclusive proof

against retaliation.'" *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)

(quoting *Robinson v. SEPTA*, 982 F.2d 892, 894 (3d Cir. 1993)) (citing *Kachmar v. Sungard

Data Systems, Inc.*, 109 F.3d 173 (3d Cir. 1997); *Aman v. Cort Furniture Rental Corp.*, 85

F.3d 1074, 1085 (3d Cir. 1996)).   *Woodson* noted that a period of almost two years

between the protected activity and the adverse action coupled with a pattern of harassment

during the time period has been found sufficient to support a causal link.  109 F.3d at 920

(citing *Robinson*, 982 F.3d at 895).

Plaintiff asserts that she was terminated within several months of her 2018 requests

for medical leave: she requested and was approved leave in April 2018, she took FMLA-

approved time off in October and November 2018, and she was terminated within weeks of

taking the approved leave.  (Doc. 47 at 56.)  Plaintiff adds that she was subjected to

antagonistic treatment after her requests for medical/FMLA leave which continued up to her

termination.  (*Id.*)

In its reply brief, Defendant does not refute Plaintiff's assertions regarding timing but

states that she relies on only timing and pretext.  (Doc. 52 at 20.)  Defendant provides no

citation to support this conclusion. (*See id.*)  Nor does Defendant provide evidence to refute

Plaintiff's statement that "[a]fter her complaints of discrimination *and her requests for*

*FMLA/medical leave*, [she] was subjected to antagonistic treatment and this continued

through her termination" (Doc. 47 at 56 (emphasis added)).  In its supporting brief,

Defendant states that "there is no evidence that Plaintiff's leave was taken into account

when determining whether she was underperforming under the established objective

criteria" and "Mr. Yescavage—the individual Ms. Woods claims was bothered by her taking

leave—had no decision making role in Ms. Wood's termination."  (Doc. 42 at 12-13.)  In

support of the first assertion, Defendant notes that "[t]he record is clear that periods of

absence from the territory were not held against employees since their partners in the field

called on the same customers and could cover."  (Doc. 42 at 12 n.3.)

For reasons previously discussed, Defendant's arguments do not show that Plaintiff

cannot establish the causation element of her FMLA claim.  Because there are material

questions about whether the use of FMLA leave affected Plaintiff's 2017 performance rating

and why extenuating circumstances were not identified or discussed regarding that rating,

*see supra* pp. 18-19 & n.6, Barton's motivation for not identifying extenuating circumstances

remains relevant to the causation element of the prima facie case for FMLA retaliation and

cannot be decided on summary judgment.  Because Plaintiff also took FMLA leave in 2018,

what, if any, role that played in her anticipated 2018 performance is unclear.  Further, the

Court has also found that the objectivity of Defendant's evaluation process is at issue as is

the role played by Yescavage's subjective assessments of Plaintiff's performance in the review process. *See supra* pp. 20-21. For these reasons, Defendant's have not established that Plaintiff cannot establish the causation element of her prima facie case.

Rather, the Court concludes that Plaintiff has produced sufficient evidence to satisfy this element. Plaintiff points to both the proximity of her termination to her November 2018 FMLA leave and the negative comments related to the taking FMLA leave. (*See* Doc. 47 at 56.) Because Plaintiff was terminated within weeks of taking FMLA leave in November 2018 and has consistently averred that Yescavage's negative comments related to taking leave continued through 2018 (*see, e.g.*, Doc. 47-1 ¶ 33), the authority cited above supports the conclusion that Plaintiff has produced sufficient evidence to satisfy the third element of the prima facie FMLA retaliation case.

Regarding the pretext stage of the *McDonnell Douglas* analysis, the parties rely on the pretext arguments discussed in the context of the gender and disability discrimination claims. (*See* Doc. 42 at 26; Doc. 47 at 56; Doc. 52 at 7, 20.) Thus, the Court's determination that a reasonable jury could disbelieve Defendant's proffered reason or believe that an invidious discriminatory reason was more likely than not a determinative cause of the Plaintiff's termination, *Fuentes,* 32 F.3d at 764, *see supra* pp. 25, 35, also applies to the FMLA retaliation claim.

**2. Title VII and ADA Retaliation**

Defendant contends that Plaintiff cannot succeed on her Title VII and ADA retaliation claims because she cannot point to any evidence of a causal connection between her 2018 complaints and her termination which requires a causal connection between the employee's protected activity and the employer's adverse action.  (Doc. 42 at 17 (citing *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2105)).)

Retaliation claims under Title VII and the ADA are analyzed under the same structure as is the PHRA unless specifically indicated otherwise by the language of the PHRA.  *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) (citing *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)). The parties have not identified any such distinction here.

> To establish a prima facie case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."

*Fogleman*, 283 F.3d at 567–68 (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *see also Griffin v. Municipality of Kingston*, 453 F. App'x 250, 253 n.6 (3d Cir. 2011).  In *Fogleman*, the Third Circuit noted that precedent interpreting the anti-retaliation provisions of Title VII or the ADA is equally relevant to the other statute.  283 F.3d at 567.

Causation can be shown through temporal proximity between the protected activity and the adverse employment action; an intervening pattern of antagonism; or the evidence taken as a whole. *Griffin*, 453 F. App'x at 253 n.6 (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280–81 (3d Cir.2000); *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997)).

Plaintiff asserts that she was terminated within several months of her January 2018 complaints; Yescavage, Barton, and Gaskins were well aware of Plaintiff's complaints of discrimination; Barton provided information to Wooten and Gaskins that they relied on in selecting Plaintiff form termination; and, after her complaints of discrimination, she was subjected to antagonistic treatment that continued through her termination.  (Doc. 47 at 56.)

Defendant posits that Plaintiff cannot show causation for the following reasons: the group of individuals who made the decision to terminate Plaintiff did not have retaliatory animus because they were not the targets of the complaint; the criteria for selection of employees for termination was based on objective factors which Plaintiff fit; the timing is not unusually suggestive (ten months between complaint and termination); there were no acts of intervening antagonism between her complaints and termination; and Plaintiff's misconduct and the review of her performance break the chain of causation between her protected activity and her termination.  (Doc. 42 at 18-22.)

The span of ten months does not defeat Plaintiff's claim in that she has consistently averred that Yescavage's negative comments related to taking leave continued through

46

2018 (see, e.g., Doc. 47-1 ¶ 33). Defendant's argument that causation cannot be established because the objective decisionmakers were not targets of the complaint and relied on objective criteria is not persuasive because the allegedly objective decisionmakers need not have been the target of the complaint to be influenced by it, and their objectivity is an issue which has not been conclusively established for reasons previously discussed. Similarly, Defendant's conclusory statement that there were no acts of intervening antagonism points to a disputed matter which cannot be decided at this stage of the proceedings. Finally, whether a causal chain was broken by misconduct or the 2018 performance review cannot be decided on summary judgment based on the previous findings that material issues remain as to the subjective component of Plaintiff's performance review and how Plaintiff's misconduct was factored into the termination decision.

Finally, for the reasons previously discussed regarding the third stage of Plaintiff's discrimination and FMLA retaliation claims, the Court's determination that a reasonable jury could disbelieve Defendant's proffered reason or believe that an invidious discriminatory reason was more likely than not a determinative cause of Plaintiff's termination, Fuentes, 32 F.3d at 764, see supra pp. 25, 35, 43, also applies to the Title VII and ADA retaliation claims.

## E. **Hostile Work Environment Claims**

Defendant argues that, even if Plaintiff could establish that Defendant engaged in the

conduct which allegedly supports her hostile work environment claims, the alleged

comments and conduct are insufficient to establish hostile work environment under Title VII,

the ADA, or the PHRA.  (Doc. 42 at 29-36.)  Defendant cites the following ways Plaintiff

alleges Yescavage discriminated against her:

- Gave Ms. Woods and two other females (who were also working mothers on Ms. Woods' team) an article captioned: "How to Handle Work When Your Child Is Sick" in conjunction with a work-related meeting;

- Stated to Ms. Woods on numerous occasions: based upon "your medical leave" issues, "you're not going to last," and "I have to get people in place to help you" because of her medical issues;

- Stated he did additional hiring in case Ms. Woods decided to have another baby or get sick again;

- Stated "your kids are always sick" and questioned Ms. Woods' ability to bring her baby on a plane;

- Stated Ms. Woods was ineligible for a CVMD Sales Training Position when she expressed an interest in the available role because, "It's not for people with small children. It involves a lot of travel."

- Sent pictures of beer and moonshine to team members including Ms. Woods indicating what is masculine in his view;

- Implied to Ms. Woods on numerous occasions that her productivity was in question because of her health, medical absences, or child-care needs;

- Demonstrated a continual preference for men over women in discussion, task assignment, and hiring (including the hiring of his male neighbor);

- Acknowledged that certain males on his team do not work or underperform and just laughed or joked about it, while treating females differently and to a much more aggressive and rigorous standard;

- Yelled and spoke abusively, abrasively, and in a demeaning manner to females as contrasted to males;

- Often stated a premise "if you have another baby" or "are out again," before discussing some aspect of Ms. Woods' work;

- Exhibited disdain verbally and through actions for usage of FMLA by Ms. Woods; and

- Referenced Ms. Woods' maternity/FMLA leaves in Ms. Woods' 2015 year-end evaluation and Ms. Woods' 2017 year-end evaluation.

(Doc. 42 at 29-31 (citing Second Amended Complaint (Doc. 26) ¶ 39).

Plaintiff does not disagree with this recitation. (*See* Doc. 47 at 14-20.) However,

Plaintiff adds that

Defendant also harassed Ms. Woods' co-worker, Amanda Haile. She also worked as a full-time PSS on the Diabetes Team under Yescavage's supervision, and was also subjected to offensive and disgusting gender-related discrimination by Yescavage during the same time-frame as Ms. Woods. For example, Yescavage got visibly angry any time Ms. Haile needed to take time off from work when her children were sick, told Ms. Haile "doesn't your husband help with the kids? Tell him to get off the couch and take care of the kids so that you can work," told her that her "personal life is too busy," gave her an article about how to handle work when your child is sick and other conduct. Exhibit U. Ms. Haile was subjected to this discrimination for two years, hurt and offended by it and told Defendant that if she was caught speaking about the issue, she would be disciplined. Exhibit U at p. P22-7-2218.

(Doc. 47 at 19-20.)

## 1. ADA Hostile Work Environment Claim

To establish a hostile work environment claim under the ADA and PHRA, a plaintiff

must prove that:

> (1) [she] is a qualified individual with a disability under the ADA;
> (2) she was subject to unwelcome harassment; (3) the
> harassment was based on her disability or a request for an
> accommodation; (4) the harassment was sufficiently severe
> or pervasive to alter the conditions of her employment and to
> create an abusive working environment; and (5) that [her
> employer] knew or should have known of the harassment and
> failed to take prompt effective remedial action.

> *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999)
> (citations omitted). To be sufficiently severe or pervasive, harassment must
> be shown to be both objectively and subjectively hostile or
> abusive. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367,
> 126 L.Ed.2d 295 (1993) ) ("[T]he environment must be objectively hostile or
> abusive, and the plaintiff must have perceived it as a hostile or abusive
> environment."). To determine whether a work environment contains
> sufficiently severe or pervasive harassment, courts consider the totality of the
> circumstances. *Id.* Generally, courts look to whether a workplace was "so
> heavily polluted with discrimination as to destroy completely the emotional
> and psychological stability of [the harassed employees]...." *Meritor Savs.
> Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)
> (citation omitted).

*Hatch v. Franklin Cnty.*, 755 F. App'x 194, 201–02 (3d Cir. 2018).  "Totality of the

circumstances" includes "'the frequency of the discriminatory conduct; its severity; whether it

is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'"  *Vanhook v. Cooper Health*

*Sys.*, No. 21-2213, 2022 WL 990220, at *5 (3d Cir. Mar. 31, 2022) (quoting *Walton*, 168

F.3d at 667).

Defendant maintains that, "even if Mr. Yescavage engaged in all the conduct alleged

by Ms. Woods, the comments do not come close to meeting the severe and pervasive

standard required to establish hostile work environment based on her disability." (Doc. 42

at 32.) Based on this assertion, Defendant concludes that "[c]onsidering the totality of

evidence presented by Ms. Woods, her claims cannot withstand summary judgment." (*Id.*

(citation omitted).)

In identifying the relevant standard to be "severe and pervasive," Defendant applies

the wrong standard in support of its assertion that Plaintiff cannot satisfy the fourth element

of her ADA hostile work environment claim. As explained in *Vanhook*,

> a plaintiff must show, among other things, that "the harassment was sufficiently severe *or* pervasive to alter the conditions of her employment and to create an abusive working environment." *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999); *see also Castleberry v. STI Grp.*, 863 F.3d 259, 263-64 (3d Cir. 2017) (*explaining that the applicable standard is "severe or pervasive and    not severe and pervasive*"); *Shepherd    v. Hunterdon Dev. Ctr.*, 803 A.2d 611, 624-26 (N.J. 2002). Because the hostile work environment test is disjunctive, "some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable[ ] conduct will contaminate the workplace only if it is pervasive." *Castleberry*, 863 F.3d at 264.

*Vanhook*, 2022 WL 990220, at *4 (emphasis added).

Reviewing Defendant's recitation of allegations related to the hostile work environment claims, the Court finds that only five of the thirteen identified relate to Plaintiff's ADA hostile work environment claim:

- [Yescavage] [s]tated to Ms. Woods on numerous occasions: based upon "your medical leave" issues, "you're not going to last," and "I have to get people in place to help you" because of her medical issues;

- [Yescavage] [s]tated he did additional hiring in case Ms. Woods decided to have another baby or get sick again;

- [Yescavage] [i]mplied to Ms. Woods on numerous occasions that her productivity was in question because of her health, medical absences, or child-care needs;

- [Yescavage] [o]ften stated a premise "if you have another baby" or "are out again," before discussing some aspect of Ms. Woods' work;

- [Yescavage] [e]xhibited disdain verbally and through actions for usage of FMLA by Ms. Woods[.]

(Doc. 42 at 29-31 (citing Second Amended Complaint (Doc. 26) ¶ 39).  Plaintiff's allegations related to Ms. Haile are not considered for purposes of the ADA hostile work environment claim because they do not relate to disability.

Given the totality of the circumstances, accepting as true that the allegations regarding Plaintiff's medical issues and related missed work time were made with the frequency identified, the Court does not find that statements about medical issues and related matters made "on numerous occasions" over a three-year period are sufficient to support the claim.  The statements are not of the severity contemplated in that the alleged

statements, if not pervasive, would not "contaminate an environment," *Castleberry*, 863

F.3d at 264.  Nor does the record support a finding that the allegations related to Plaintiff's

ADA claim point to "harassment that was sufficiently . . . pervasive to alter the conditions of

her employment and to create an abusive working environment."  *Walton*, 168 F.3d at 667.

Plaintiff recognizes that she must show that her workplace was "'permeated with

discriminatory intimidation, ridicule, and insult . . . to alter the conditions of [her] employment

and create an abusive working environment'" (Doc. 47 at 20 (quoting *Harris v. Forklift Sys*.,

510 U.S. 17, 21-23 (1993)), yet she presents no evidence that comments related to

disability permeated her workplace.  Therefore, the Court concludes that Plaintiff has not

come forward with sufficient evidence to survive summary judgment on her ADA hostile

work environment claim, and summary judgment will be granted on this claim.

## 2. Title VII Hostile Work Environment Claim

> To succeed on a Title VII hostile work environment claim, the plaintiff must establish
>
> that 1) the employee suffered intentional discrimination because of his/her
> sex, 2) the discrimination was severe or pervasive, 3) the discrimination
> detrimentally affected the plaintiff, 4) the discrimination would detrimentally
> affect a reasonable person in like circumstances, and 5) the existence
> of *respondeat superior* liability. . . . The first four elements establish a hostile
> work environment, and the fifth element determines employer liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citations omitted).[12]

---

[12] This standard differs from that identified by Defendant which identifies the second element as
"pervasive and regular" and does not contain the fifth element.  (*See* Doc. 42 at 34 (citing *Andreoli v.
Gates*, 482 F.3d 641, 643 (3d Cir. 2007)).  Subsequent to the *Andreoli* decision, the Circuit Court
recognized its inconsistent precedent regarding the second element and clarified the appropriate standard
in *Castleberry*, 863 F.3d at 263-64.  In discussing the district court's application of the "pervasive and

Reviewing Defendant's recitation of allegations related to Plaintiff's hostile work

environment claims and Plaintiff's response to Defendant's assertion that she cannot satisfy

the second element of her hostile work environment claims, the Court concludes that the

_____

regular" standard and the plaintiffs' argument that the "severe or pervasive" standard was appropriate, the Circuit Court stated that

> Plaintiffs are correct even though our precedent is inconsistent. We have held that, to prevail on a harassment or hostile work environment claim, the plaintiff "must establish that ... the discrimination was severe or pervasive." *Mandel*, 706 F.3d at 167 (3d Cir. 2013) (citation omitted); *see Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006); *Jensen*, 435 F.3d at 449; *see also Miller v. Thomas Jefferson Univ. Hosp.*, 565 Fed.Appx. 88, 93 n.6 (3d Cir. 2014) (quotation omitted); *Brooks v. CBS Radio, Inc.*, 342 Fed.Appx. 771, 775 (3d Cir. 2009); *Hamera v. Cnty. of Berks*, 248 Fed. Appx. 422, 424 (3d Cir. 2007) (quotation omitted).
>
> We have also held that a plaintiff making such a claim must establishe that the discrimination is "pervasive and regular." *Andreoli v. Gates*, 482 F.3d 641, 643, (3d Cir. 2007) (quotation omitted); *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *see also Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 Fed. Appx. 132, 140 (3d Cir. 2012) (quotation omitted); *Ocasio*, 92 Fed. Appx. at 879 (quotation omitted).
>
> To make matters even more confusing, we have also determined that the correct standard to apply is "severe and pervasive." *Hare v. Potter*, 220 Fed. Appx. 120, 131-32 (3d Cir. 2007). And if that were not enough, we have held that the correct standard to apply is "pervasive and regular" but then applied the "severe or pervasive" standard within the same opinion. *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001).
> 89Thus we clarify. The correct standard is "severe *or* pervasive." The Supreme Court has articulated as much on several occasions. *See, e.g., Pa. State Police v. Suders*, 542 U.S. 129, 133, 124 S. Ct. 2342, 159 L.Ed.2d 204 (2004); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993). We have noted that "[t]he difference [between the two standards] is meaningful" because "isolated incidents (*unless extremely serious*) will not amount to [harassment]." *Jensen*, 435 F.3d at 449 n.3 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998)). Indeed, the distinction "means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* (quoting 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, Employment Discrimination Law and Practice 455 (3d ed. 2002)).

*Castleberry*, 863 F.3d at 263–64.

following allegations upon which Plaintiff relies (*see* Doc. 47 at 17-20) potentially relate to

gender discrimination. They are that Yescavage

- Gave Ms. Woods and two other females (who were also working mothers on Ms. Woods' team) an article captioned: "How to Handle Work When Your Child Is Sick" in conjunction with a work-related meeting;

- Stated he did additional hiring in case Ms. Woods decided to have another baby or get sick again;

- Stated "your kids are always sick" and questioned Ms. Woods' ability to bring her baby on a plane;

- Stated Ms. Woods was ineligible for a CVMD Sales Training Position when she expressed an interest in the available role because, "It's not for people with small children. It involves a lot of travel."

- Often stated a premise "if you have another baby" or "are out again," before discussing some aspect of Ms. Woods' work;

- Referenced Ms. Woods' maternity/FMLA leaves in Ms. Woods' 2015 year-end evaluation and Ms. Woods' 2017 year-end evaluation.

(Doc. 42 at 29-31 (citing Second Amended Complaint (Doc. 26) ¶ 39).[13]

Plaintiff's allegation of gender-related discrimination related to Haile is also relevant

to this claim.  Specifically, Plaintiff alleges that

Yescavage got visibly angry any time Ms. Haile needed to take time off from work when her children were sick, told Ms. Haile "doesn't your husband help

---

[13] In support of her hostile work environment claim, Plaintiff does not rely on the previously identified text messages, *see supra* p. 5, the allegation that Yescavage demonstrated a continual preference for men over women, that he made comments about men on his team underperforming and held women to a more rigorous standard, and that he yelled and spoke abusively, abrasively, and in a demeaning manner to females as contrasted to males.  (*See* Doc. 42 at 30; Doc. 26 ¶ 39.)

with the kids?  Tell him to get off the couch and take care of the kids so that you can work," told her that her "personal life is too busy," gave her an article about how to handle work when your child is sick and other conduct.  Exhibit U.  Ms. Haile was subjected to this discrimination for two years, hurt and offended by it and told Defendant that if she was caught speaking about the issue, she would be disciplined.  Exhibit U at p. P22-7-2218.

(Doc. 47 at 19-20.)

As with her ADA hostile work environment claim, Plaintiff's gender-related allegations are not of sufficient severity to satisfy the "severe or pervasive" requirement. Nor has Plaintiff produced evidence which establishes the pervasiveness of her gender-related accusations.  Yescavage's comments made "multiple times" over a three-year period about the impact of another possible pregnancy coupled with other alleged incidents which took place in the same time period, i.e., the dissemination of an article about handling work when a child is sick, a comment about ineligibility for a position, a comment about taking her baby to a meeting, and the identified comments made to Haile over a two-year period (*see* Doc. 47 at 18-19), taken together, do not support a conclusion that the "harassment that was sufficiently . . . pervasive to alter the conditions of her employment," *Walton*, 168 F.3d at 667, or that Plaintiff's workplace was "'permeated with discriminatory intimidation, ridicule, and insult," *Harris,* 510 U.S. at 21.  Therefore, the Court concludes that Plaintiff has not come forward with sufficient evidence to survive summary judgment on her Title VII hostile work environment claim, and the Court will grant summary judgment on this claim.

## V. Conclusion

For the reasons set out above, the Court will grant Defendant's Motion for Summary Judgment (Doc. 39) in part and deny it in part.  The Court will grant the Motion with respect to Plaintiff's claims for hostile work environment.  The Court will otherwise deny the Motion. The Court notes that Plaintiff is not proceeding on her post-employment retaliation claim. (*See* Doc. 47 at 49 n.8.)  A separate order will be entered.

Robert D. Mariani
United States District Court